**NEW ENGLAND TELEPHONE & TELEGRAPH CO.**

v.

**CENTRAL VERMONT PUBLIC SERVICE CORP. and Rutland Cable TV, Inc.**

**Civ. A. No. 6502.**

United States District Court,
D. Vermont.

March 17, 1975.

Corsones, & Griffin, Rutland, Vt., for plaintiff.

Miller & Hill, Rutland, Vt., for defendant Osmose Wood Preserving Co.

Douglas C. Pierson, Richard W. Affolter, Burlington, Vt., for defendant New Eng. Tel. & Tel. Co.

Theriault & Joslin, Montpelier, Vt., for defendant, Rutland Cable T. V., Inc.

Dinse, Allen & Erdmann, Burlington, Vt., for defendant, Central Vt. Public Service Corp.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and OPINION

OAKES, Circuit Judge, Sitting by Designation.

David Sharp, an employee of Central Vermont Public Service Corp. (CV), was seriously injured on February 16, 1970, while in the process of doing his work as a third class lineman for CV on a pole owned by New England Telephone & Telegraph Co. (Telco) as a result of the pole's falling. Having climbed the pole, hereinafter designated as X–1, he was pulling up a de-engerized primary line being strung from Pole X–1 to a Pole 17, according to testimony of C. William Mulholland who was then working on the ground. Pole X–1 contained near the ground line interior rot which was not visible or readily detectable either by the eye or by a person with David Sharp's experience using his company-prescribed sounding test, i. e., hitting the pole several times with a wrench or hammer at or near the ground line. Pole X–1 was owned by Telco. Although not using the pole, Telco as owner was required under contract to maintain and inspect it. The pole was used by CV and had one Rutland Cable TV (Cable TV) attachment. This action is one for indemnity by Telco for $50,000 paid in connection with a settlement upon a convenant not to sue after David Sharp brought an action against Telco and Osmose Preserving Co., a contractor which performed inspection and treatment of utility poles for both CV and Telco, plus attorneys' fees and expenses of $20,043.57. Also involved is a counterclaim by CV against Telco for its Workmen's Compensation payments made to David Sharp and attorneys' fees in connection with this suit. Detailed findings as to the history of the pole, the events on the date of the accident and the dealings among the parties follow.

## FINDINGS OF FACT

1. Pole X–1, the first pole on Roberts Avenue west of North Main Street in Rutland, Vermont, was originally installed by CV in 1955.

2. It was a western red cedar pole which was treated or impregnated with preservative.

3. It came from the stock of poles of CV and was newly installed in the Roberts Avenue location at that time.

4. The location is on an incline sloping down from east to west.

5. The pole with cross arms was installed with approximately 5½ feet of the butt inserted in the ground and the remaining 30 feet in the air, on the plumb, that is, not at an angle.

6. The pole constituted a dead end for CV's electric service on Roberts Avenue, the "feed," i. e., the flow of electricity, on Roberts Avenue being from west to east.

7. There was originally no CV line attachment from Pole X–1 to Pole 17, the closest North Main Street pole, one which carries north-south electric, telephone and cable TV service.

8. Pole X–1 carried three CV primary conductors or wires, i. e., two energized primary wires and one neutral wire, as well as three secondary CV conductors, all also running to Pole 1, the next pole westerly on Roberts Avenue and deadending on Pole X–1.

9. Since the tension on Pole X–1 was from the west, a head guy was installed running from the pole more or less in a straight line to the east across North Main Street to an elm tree about 30 inches in diameter; this head guy exerted a contrary tension.

10. No other guys, support wires or braces were used in connection with Pole X–1.

11. Pole X–1 was one of 527 joint use CV-owned poles in a Telco maintenance area transferred in ownership to the telephone company at some time between August 18, 1961, when Exhibit 16, an instrument indicating intent to transfer, was signed, and October 21, 1963, when an exchange of billings (Exhibit 22) in the amount of $15,935.26 was made.

12. As the result of such transfer of ownership, under the agreement between Telco and CV dated April 1, 1929, relative to the joint use of wood poles located in the Rutland telephone exchange area, as amended by their agreement of September 22, 1959, taking into account a July 14, 1959, joint licensing agreement between Telco and CV as licensors and Cable TV as licensee, Telco and CV each assumed certain obligations or duties.

13. Those obligations and duties will be dealt with more specifically in the conclusions of law hereinbelow, but one is the duty of Telco to "maintain [Pole X–1] . . . in a safe and serviceable condition, and in accordance with [certain specifications] . . . and

[to] replace . . . such of said poles as become defective."

14. Telco breached this duty because Pole X–1 was not in a safe and serviceable condition and was at the time of the accident defective.

15. In so doing, there is no evidence in this record, however, that Telco was negligent since the pole was not due for inspection and ground treatment until 1975 under the ordinary and regular procedures used by utility companies in New England.

16. Moreover, although the pole was defective, so long as the head guy and conductors from X–1 were maintained in place, the pole in all probability would not have fallen.

17. There is nothing to show that Telco knew or should have known that the pole was rotten or defective.

18. A duty on the part of CV under the April 1, 1929, agreement (see Article 5) was to give 90 days' notice to Telco of its contemplated change in the character of its circuits on Pole X–1 (by installing a new connection of primary circuits to Pole 17 on North Main Street, thereby changing the flow of current on Roberts Avenue to east-west).

19. This duty was breached by CV, but its breach did not cause Telco any harm and is not relied upon by Telco.

20. As mentioned, by agreement dated July 14, 1959, Telco and CV as licensors permitted Cable TV as licensee, upon application and approval, to use their poles to string its cable and messenger wire.

21. This agreement is contained in Exhibit 13 and was modified on April 27, 1961, and on February 16, 1968, as contained in Exhibit 14.

22. A TV cable was installed in 1962 running from Pole 1, the next pole westerly of Pole X–1 on Roberts Avenue, to Pole X–1 and thence at a 59° angle to the south-southeast to Pole 17 on North Main Street.

23. This cable consisted of a coaxial cable lashed by .045 lashing wire to a 109 support wire (an example contained in defendant Cable TV's Exhibit A) and was pulled as tight as it could be pulled from Pole 1 to Pole X–1 but was given a slack line to Pole 17.

24. The cable was supported on Pole X–1 by a J bracket (which was attached to the pole by drive lags driven by a hammer) and to which the support wire was clamped.

25. The TV cable, even though somewhat slack, exerted some additional tension on the pole the degree of which it is impossible to reconstruct since no reliable evidence shows how slack the cable was strung from X–1 to Pole 17 in 1970.

26. There is, therefore, no showing that Cable TV was in breach of its duties under Article III(a) of the April 27, 1961, agreement or the duty under Article III(b) "to protect against . . . injury or damage to persons . . . including employees . . . of the Licensors."

27. Cable TV did not have notice as required by Article V(a) from CV that CV was going to "make a change in the type of character of any of its attachments."

28. Under Article V(b) "Any and all changes in existing facilities including additional guying necessary by reason of proposed attachments shall be performed by the Licensors . . . ."

29. If Cable TV's attachment had created a dangerous condition, Cable TV did not receive any notice from the licensors (CV or Telco) that the condition should be remedied under Article V(b) or under Article VII(b).

30. The responsibility of Cable TV under Article XI(a) will be discussed below.

31. The accident to David Sharp occurred when he and C. William Mulholland were part of a crew with Anthony E. Fusco as foreman.

32. As foreman, Fusco had the duty to make certain that David Sharp made a proper test for decay before climbing, both under Exhibit 19, the CV Safety Instruction Manual and in light of Sharp's relative inexperience.

33. Pole X–1 could not be properly tested under Rule 11 of the "Special Instructions for Electric Line Department Employees" (Exhibit 19, p. 87) requiring testing for below ground level decay by removal of dirt from around the pole, because the ground was frozen.

34. However, under Rule 12 (*id.*) where "it is impossible to test pole due to frozen ground . . . the pole must first be braced with pike poles and then temporarily guyed as required in the judgment of the foreman; moreover, "[p]ike poles must be attended if they cannot be grounded securely."

35. By not using pike poles and by not temporarily guying the pole in issue in accordance with its own safety regulations, CV was negligent.

36. While there was some testimony that pike poles, which are 14 feet long and approximately two inches in diameter, with a sharp end, could not be used because of the slope of the ground, the court does not find this to be the fact.

37. The court also finds that even if pike poles could not be used, CV was negligent since temporary guying was possible and not used, despite the inability to make a proper test as required by the safety manual. It is apparent in Exhibit 5 that the boom truck there pictured could have been used, and there is some evidence that it was in the vicinity before the pole was climbed.

38. In any event, the court takes judicial notice that Roberts Avenue is only a few minutes away from the central offices of CV in Rutland. A simple phone call could have made such a truck available.

39. The pole could have been stabilized by securing it to the truck boom.

40. In short, extra precautions before climbing the pole were required because there had to have been doubt as to the condition of the pole below ground,

both because the age of the pole was evident from the degree of weathering and numerous spur marks and also because the ground was frozen.

41. CV's negligence is in no way diminished by the fact that on the preceding Friday, February 13, as testified to by Mr. Fusco, another person had safely climbed Pole X–1 to install some hardware preparatory to the job that was to be done on Monday by the Sharp-Mulholland crew.

42. The only strain on the pole on Friday, February 13, was from the man climbing whereas the strain to be imposed on the pole on Monday, February 16, would include a replacement of the head guy by an anchor guy and a connection—even if on a "slack span" basis —of primary wires from Pole X–1 to Pole 17.

43. With the Cable TV line which, whether or not slack, created a corner stress and with a new guying situation plus new conductors leading from X–1 to Pole 17 and no way to offset that slack span from X–1 to Pole 17 by a guy because it would have to be in the street, it was negligent not to take measures to support Pole X–1 with the boom truck.

44. Additional proof of the stresses on this pole lies in the fact that the replacement pole for X–1 now in the ground leans toward Pole 17, permitted to do so intentionally but nevertheless pointing out the stress or tension toward the south with no offsetting guy.

45. Temporary support at the time of the accident was essential.

46. In fact, when David Sharp did climb Pole X–1, even though the anchor guy was properly installed so as at least to offset the tension from the primary and secondary conductors from Pole 1 (if not to offset the Cable TV or other tensions from the new installation to Pole 17), the head guy was cut under orders of Foreman Fusco after specific query of him by David Sharp.

47. This cutting of the head guy across North Main Street caused Pole X–1 to vibrate despite the tightened new anchor guy and was a sign that Pole X–1 was under some additional stress not wholly taken up by the new anchor guy.

48. Even at that point the accident could have been avoided if pike poles and temporary guying had been used. While it was not until some 20 minutes after the head guy was cut that the pole fell and David Sharp was injured, it was as a result of the additional stresses on the pole both from the TV cable and from the new connection being drawn up to Pole 17.

49. It was precisely during the pulling up of the de-energized primary line being strung from Pole X–1 to Pole 17 around the shoe on the crossarms that, in combination with David Sharp's additional weight leaning toward the southeast and reaching out toward the crossarm, the pole fell in a generally southerly direction as indicated in the photographs.

50. As previously found, the pole contained interior rot which was not visible nor readily detectable.

51. While the pole might have evidenced some exterior rot according to the testimony of the witness Frank E. Butkovich while examining a photograph showing the pole and butt, this exterior rot was not visible to David Sharp at the time of the accident.

52. Since Sharp was an inexperienced lineman and subject to Fusco's orders, even though Sharp was also required to be familiar with the 153 pages of safety instructions in his Safety Instruction Manual, he would have been held no more than 10 per cent responsible for the accident by virtue of his own contributory negligence in failing to insist that the Safety Instruction Manual be followed.

53. A jury might have found Sharp not contributorily negligent in any respect because Rule 12(a) uses the language "as required in the judgment of the foreman."

54. CV paid David Sharp temporary total disability payments of $8,000 including medical and hospital payments

under its own self-insured Workmen's Compensation responsibility; in all probability a claim for permanent disability will be filed and paid but in an amount unascertainable and purely speculative at the present time.

55. CV reasonably paid $7,250 in services and expense to Messrs. Dinse, Allen & Erdmann for their legal work in connection with this case consisting of in excess of 200 hours at a rate of approximately $35 per hour.

56. Telco reasonably paid $20,000 of attorneys' fees and disbursements to Messrs. Pierson and Wadhams for their legal services at the rate of $40 per hour for approximately 500 hours of services in connection with the defense of David Sharp's original suit against Telco and the preparation of this indemnity suit and defense of the CV counterclaim.

57. These findings as to legal services are based upon the court's examination of the 90 documents in the file, the numerous memoranda of law prepared on the part of all parties, the motions and hearings thereon, the discovery had by the parties, the complexities of the original suit, indemnity claim and counterclaim, the difficulty of the services performed on all sides and the manner of presentation of the case as set forth in the file.

58. Such charges are reasonable for the Rutland and Burlington, Vermont, area of legal practice and would indeed be substantially higher were they incurred in, e. g., the city of New York.

## CONCLUSIONS OF LAW

■ The court finds that neither Telco nor Cable TV was negligent in connection with David Sharp's accident. The court finds that CV was negligent and that its negligence contributed 100 per cent to cause the accident, although a jury might have found that David Sharp was between 0 and 10 per cent

contributorily negligent. Any contributory negligence of David Sharp is wholly discounted since he was an employee of CV in this indemnity suit. Telco did not pay Sharp as a volunteer since Telco had contractual duties running to Sharp as a third party beneficiary. These included the duties of inspection, maintenance and providing a safe pole, none of which Telco performed, even though there is no showing here that it was negligent in failing to perform those contractual duties. Telco may not recover against CV as a joint tortfeasor, *Howard v. Spafford*, 132 Vt. 434, 321 A.2d 74 (1974), except upon either an express indemnification provision in the contract, *Spalding v. Oakes, Adm'r*, 42 Vt. 343 (1869), or on the basis that it was CV's active negligence, *see* Viens v. Anthony Co., 282 F.Supp. 983 (D.Vt. 1968), rather than Telco's passive breach of duty which caused the accident. *See also* Farr v. J. Scanlon Co., 441 F.2d 1090 (2d Cir. 1971). CV did not breach any express or implied warranties to Telco in connection with the sale or transfer of the pole. Were CV not an employer who had paid its employee workmen's compensation under the Vermont Workmen's Compensation law, 21 V.S.A. § 601 et seq., and hence entitled to the benefits of 21 V.S.A. § 622[1] which makes the workmen's compensation remedy of CV's employee exclusive, CV would be responsible to Telco to indemnify it on both grounds: first, under Article 13, Section 2, of the April 1, 1929, contract, "[e]ach party shall be liable for all damages for such injuries to its own employees . . . that are caused by the concurrent negligence of both parties hereto or that are due to causes which cannot be traced to the sole negligence of the other party"; second, it was CV's "active negligence" in omitting to take sufficient temporary precautions in placing new tensions on Pole X–1 as set forth in the facts above that

1. The rights and remedies granted by the provisions of this chapter to an employee on account of a personal injury for which he is entitled to compensation under the provisions of this chapter shall exclude all other rights and remedies of such employee, his personal representatives, dependents or next of kin, at common law or otherwise on account of such injury.

was the immediate and most proximate cause of the accident to David Sharp.

■ The question whether the exclusivity provision of the Vermont act precludes an indemnification action against the employer is one that has not been answered in the Vermont courts. Chief District Judge Leddy assumed without deciding that there was no preclusion in Farr v. J. Scanlon Co. See 441 F.2d at 1091. The question has been answered by different courts differently. Some state that the exclusivity provision relates solely to the employee's remedy. *E. g.*, Trail Builders Supply Co. v. Reagan, 430 F.2d 828 (5th Cir. 1970) (following Florida law quoted at 831). Others, giving the exclusivity provision a broader construction, state that indemnification accrues only because of common liability and when that is absent (as to the employer, once it has paid compensation)· there can be no indemnity and a contract provision to the contrary is void. *E. g.*, Gulf Oil Corp. v. Rota-Cone Field Operating Co., 84 N.M. 483, 505 P.2d 78 (1972). Pointing out that the question is "[p]erhaps the most evenly-balanced controversy in all of compensation law," Larson (2 Workmen's Compensation Law § 76.10, 14–287, hereinafter 2 Larson), while citing *Gulf Oil Corp., supra,* to the contrary, indicates that where an express contractual obligation to indemnify is involved, the exclusivity section generally is held not to bar recovery, on the basis that the third party's action for indemnity is not for the "damages" referred to therein but for reimbursement, and not "on account of" the employee's injury but on account of an independent duty owed by the employer to the third party. *Id.* at § 76.30, 14–324. *E. g.*, Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); 2 Larson § 76.41 n. 37. Where there is at most only an implied obligation of care arising from a contractual relationship, however, the state cases sharply diverge. *Id.* at § 76.43(d) n. 61–62, 14–388–89. We need not reach the subtle (or nonexistent) distinctions between "active" and "passive" negligence or actual and constructive fault, *see* General Electric Co. v. Cuban American Nickel Co., 396 F.2d 89, 97–98 (5th Cir. 1968), for here we do have an express indemnity claim. While the Vermont Supreme Court has not yet determined whether to follow Dole v. Dow Chemical Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), in replacing contribution with indemnity, it has refused to follow it in replacing the all-or-nothing outcome in indemnity with proportionate-responsibility sharing, despite Vermont's new comparative negligence statute. Howard v. Spafford, *supra*. This does not mean, however, that the Vermont Supreme Court would also hold that no indemnity is permissible in an express contractual situation. Rather, I suspect it would follow the view taken by the majority, 2 Larson, *supra* at § 76.30–76.-41, in light of Spalding v. Oakes, Adm'r, *supra*, and on the basis that to hold otherwise would be to fail to give effect to the intent of the contracting parties. Here the parties contracted having the Workmen's Compensation Act in mind as demonstrated by the specific language of Article XIII(4) of the April 1, 1929 agreement.[2]

While Article XIII(4) is ambiguously drafted in that it does not state whether workmen's compensation payments shall on the one hand be the only damages

2. Article XIII(4):
 Where, on account of injuries of the character described in the preceding paragraphs of this article, either party hereto shall make any payments to injured employees or to their relatives or representatives in conformity with (1) the provision of any workmen's compensation act or any act creating a liability in the employer to pay compensation for personal injury to an employee by accident arising out of and in the course of the employment, whether based on negligence on the part of the employer or not, or (2) any plan for employees' disability benefits or death benefits now established or hereafter adopted by the parties hereto or either of them, such payments shall be construed to be damages within the terms of the preceding paragraphs numbered 1 and 2 and shall be paid by the parties hereto accordingly.

**428**

within the terms of paragraph 2 [3] or on the other hand be included in paragraph 2 damages, the interpretation of inclusion is the only one which does not nullify paragraph 2. If workmen's compensation were the sole measure of indemnity damages the phrase "liable for *all* damages for such injuries" (emphasis added) would have no effect since damages from injury can clearly exceed the limits of workmen's compensation.

■ Vermont has always construed the Workmen's Compensation statute in the case of ambiguity in a manner which favors the injured employee, *e. g.*, Herbert v. Layman, 125 Vt. 481, 218 A. 2d 706 (1966) (permitting employee to sue his fellow servant as a third party). While the present case in no way affects the employee's rights, recovery on an express indemnification basis would coincidentally seem better to place responsibility on the ultimate wrongdoer, at least so far as fault was concerned. In any event these were two substantial corporations, of equal bargaining power, who may be taken to have known what they were doing when they wrote the contract pertaining to joint poles as they did. The order of the court is that CV be required to reimburse Telco for the $50,000 paid and attorneys' fees and expenses in the sum of $20,000.

■ CV's counterclaim against Telco is dismissed, since CV's negligence was independent of the negligence imputable to it as a result of any conduct by David Sharp and therefore bars recovery under 21 V.S.A. § 624 of compensation paid. *See* Essick v. City of Lexington, 233 N. C. 600, 65 S.E.2d 220 (1951); Witt v. Jackson, 57 Cal.2d 57, 17 Cal.Rptr. 369, 366 P.2d 641 (1961). It is this court's view that the Supreme Court of Vermont would decline to follow the suggestion of Corley v. Workmen's Compensation Appeals Board, 22 Cal.App.3d 447, 99 Cal.Rptr. 242 (1971), that would permit CV to use its compensation paid as an offset to indemnity, particularly as

Vermont does not believe a wrongdoer should be compensated. *See generally* Dubie v. Cass-Warner Corp., 125 Vt. 476, 218 A.2d 694 (1966). In addition, although Article XIII(4) implies that workmen's compensation payments are Article XIII(2)· damages, it does not mean that Telco must bear the cost of the workmen's compensation when it is entitled to indemnification. Rather it means that damages to Sharp are $58,000.

As indicated above, there is no showing of any possible responsibility on the part of Rutland Cable TV to indemnify either Telco or CV unless the statement in Article XI(a) of the contract of April 27, 1961, that

> [w]hether caused by the negligence of the Licensors or either of them, or otherwise, the Licensee shall indemnify and save harmless the Licensors and either of them from any and all claims . . . including injuries to the employees . . . of the Licensors or either of them . . . arising out of, resulting from or in any manner caused by the installation, presence, use or maintenance of such attachments on the poles covered by this agreement . . . .

This broad responsibility under Article XI also covers

> any payments made by the Licensors or either of them to its or their injured employees . . . in conformity with the provisions of any Workmen's Compensation Act . . . or any act creating a liability in the Licensors or either of them to pay compensation for personal injury to an employee by reason of an accident arising out of or in the course of his employment.

While it is impossible to tell the extent of the stress or added tension caused by Cable TV's attachment to Pole X–1, any attachment, slack or not, creates some stress. It is altogether probable, therefore, that the accident would not have

---

3. Article XIII(2):
   Each party shall be liable for all damages for such injuries to its own employees . . . that are caused by the concurrent negligence of both parties hereto or that are due to causes which cannot be traced to the sole negligence of the other party.

occurred had there been no Cable TV attachment. The statement of liability in Article XI is sufficiently broad to require Cable TV to indemnify both Telco and CV had Cable TV received notification of the proposed work. It was not within the contemplation of the parties, as indicated by the second sentence in Article XI(a), merely to limit the agreement to indemnify on account of liability for any alleged act of negligence asserted by Cable TV; rather, the licensee took on the duties of an insurer holding it strictly liable without fault if its attachment in any way contributed to cause the accident.

Article V of the April 27, 1961, agreement provides, however,

### MAINTENANCE OF POLES AND ATTACHMENTS

(a) Whenever the Licensors or either of them find it necessary to . . . make a change in the type of character of any of its attachments, the Licensors or either of them shall before doing the work give notice thereof, in writing (except in case of emergency, when verbal notice will be given and subsequently confirmed in writing) to the Licensee, specifying in such notice the time of such work and the Licensee shall within the time so specified rearrange or transfer its attachments to the new or relocated poles at the Licensee's cost and expense.

(b) Any and all changes in existing facilities including additional guying necessary by reason of proposed attachments shall be performed by the Licensors, and the expense thereof shall be assumed by the Licensee.

And Article VII(b) provides in part:

if at any time in the opinion of the Licensors of either of them the use by the Licensee of the poles covered by this agreement for its attachments is endangering the employees of the Licensors . . . or should the Licensors or either of them make a change in the type and character or location of any of their poles or attachments, the Licensee shall proceed at once, at its sole cost and expense, to make such changes as may be necessary, in its attachments, as a result thereof or shall discontinue the use of the facilities hereby granted, and if the Licensee shall fail to remove such default in due observance or performance of any covenants or conditions herein contained including the payment of any installment of rent, or other costs, or shall not have made such change or discontinued the use of or removed its facilities within sixty (60) days from the date the Licensee was *notified in writing* of said fact, then the Licensee's rights hereunder shall cease and terminate upon notice, in writing, from the Licensors or either of them. Such termination of the rights of Licensee, however, shall not operate as a termination of the liabilities and obligations of said Licensee which liabilities and obligations shall continue until the satisfactory removal of its facilities in accordance with the provisions hereof and after such removal as to liabilities accrued prior to the completion of said removal. In case of an emergency, verbal notice will be given and subsequently confirmed in writing. In such case either of the Licensors may, at the sole cost and expense of the Licensee, remove such attachments or take such other steps as either or both of them may deem necessary without liability to the Licensee or others.

(Emphasis added.)

■ CV failed to give notice to Cable TV of the change in attachments on Pole X–1 as was required by the agreement which also contains the indemnity clause. Nor did CV notify Cable TV that its attachment was endangering CV's employees, as required by Article VII(b). The indemnity clause is broad, but not broad enough to be independent of a breach by CV of its contractual duty to notify. With notice, *Cable TV* would have had the opportunity to remove its attachment, and thus any resulting stress.

430

■■■■■ In construing written instruments to ascertain the intention of the parties, the Vermont courts seek to give effect to every material part and to form a harmonious whole. Cross-Abbott Co. v. Howards, Inc., 124 Vt. 439, 207 A.2d 134 (1965); Breding v. Champlain Marine & Realty Co., 106 Vt. 288, 172 A. 625 (1934). The notice provisions of the April 27, 1961, agreement must be considered as being in pari materia with Article XI. Whatever stress the TV cable was causing on Pole X–1, for the eight years or thereabouts it had been in place, the stress was insufficient to cause the pole to lean, let alone to fall. It was only when CV made its "change in the type of character of . . . its attachments" that the TV cable stress came into operation causally.

Accordingly, the complaint against Cable TV is dismissed. Judgment is for Telco against CV for $70,000, together with interest at the legal rate from the time of payment of $50,000 to David Sharp and of $20,000 to Telco, and costs. Parties to settle judgment order on or before ten days from filing hereof.

So ordered.